[Cite as *State v. Shears*, 2013-Ohio-1196.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-120212 |
| | | TRIAL NO. B-1102971 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| RANDY SHEARS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Sentence Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  March 29, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michella M. Stagnaro*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1} In four assignments of error, defendant-appellant Randy Shears appeals his convictions for several crimes that arose from the robbery of two retail stores and the murder of a Springfield Township man. Because of errors that occurred during sentencing, the cause must be remanded to the trial court for correction of those errors. We affirm the trial court's judgment in all other respects.

### The Robbery of the Glenway Avenue Deals Store

{¶2} Jerry Williams was operating the cash register at the Glenway Avenue Deals store on April 21, 2011, when Randy Shears entered. Shears approached Williams from behind, grabbed him, and threw him to the floor. Shears stole $300 from the store and fled. Another store employee, who knew Shears from the neighborhood, recognized him from video footage of the attack and was able to identify Shears in a photo lineup. Williams, who never saw Shears's face, could not identify him.

### Mahesh Banatwala Reported Missing

{¶3} Mahesh Banatwala was an older gentleman who lived alone in an apartment in Colerain Township. Shears's grandmother lived in the same complex, in a building adjacent to Mr. Banatwala's. On May 2, 2011, Mr. Banatwala's estranged wife called Springfield Township police because no one had seen or heard from Mr. Banatwala. This was very unusual because he kept a regular schedule and made regular contact with family members. A police officer was dispatched to the apartment, but he saw nothing wrong.

{¶4} Two days later, a maintenance worker for the company that managed the property was cutting the grass when he found Mr. Banatwala's empty wallet. The

worker attempted to return the wallet, but no one answered the door. The property manager found a phone number for Mr. Banatwala's wife and contacted her.

{¶5} Also during this time, neighbors began to complain about barking dogs in the apartment. Since residents were not allowed to have dogs, the property manager left a notice on Mr. Banatwala's door informing him that they had to be removed. The property manager never heard from Mr. Banatwala, which was unusual. Mr. Banatwala had always promptly responded to prior notices left on his door.

{¶6} The property manager continued to attempt to reach Mr. Banatwala by phone, but was never able to get through. After several attempts, he contacted the phone company to find out if there was something wrong with the line. The phone company representative told him that the phone was off the hook. At this point, the property manager contacted the police.

{¶7} Springfield Township police officers responded and entered the apartment. They found two dogs that clearly had been neglected for days. The officers searched the apartment, but saw nothing that would suggest that a struggle had occurred. An officer placed a note on the door asking Mr. Banatwala to contact him. When the police received no contact, they issued a critical missing person alert.

**The Robbery of the Colerain Avenue
Family Dollar Store and the
Capture of Shears**

{¶8} Four days after Mr. Banatwala was first reported missing, Shears entered a Family Dollar store on Colerain Avenue. Shears placed a bag of potato chips on the counter, but then left the store claiming to need more money. When he returned to the store, Shears went behind the counter and told the employee to open the cash register. Shears threatened to kill the employee if she did not comply. The employee felt an object pressed against her that she believed was a gun. Since the employee could not

open it, Shears took the entire cash box and left. The employee later identified Shears from a photo lineup, and Shears's fingerprint was found on the snack bag.

{¶9} After Shears left, he drove to Price Hill. While in Price Hill, he was involved in a hit-skip accident. Witnesses to the accident who called the police gave the license plate number. A computer check of the number indicated that the vehicle was registered to Mr. Banatwala. When the Springfield Township police department learned that Mr. Banatwala's vehicle was being operated by someone who was clearly not Mr. Banatwala, they joined the investigation.

{¶10} Since police learned that Shears had an aunt who lived in Price Hill, their investigation focused on that address. Mr. Banatwala's vehicle was found close to the home, and officers from the different agencies watched the car from a distance and waited for Shears to return. When he did, he was allowed to enter the vehicle and drive a short distance before they stopped him. Shears leapt from the car and fled into the woods. He was arrested a short time later and taken to the Springfield Township police department.

{¶11} Mr. Banatwala's vehicle was searched. Although it had been cleaned, police found a large amount of blood in the trunk. Police also found the cash box from the Family Dollar Store in the back seat. A search of the apartment of Shears's girlfriend, Lashawna Bingham, revealed a computer later identified as belonging to Mr. Banatwala.

### The Interrogation of Shears, His Confession, and the Discovery of Mr. Banatwala's Body

{¶12} Police began questioning Shears shortly after midnight on May 7, 2011. He was informed of his *Miranda* rights, and he signed a form acknowledging that he understood them. He claimed that he had purchased the car from a "crack head" for

$300. He initially denied being involved in the robbery at the Family Dollar store, but later claimed that he could not remember because he had been drinking to celebrate his birthday. He claimed that he did not know that the car belonged to Mr. Banatwala, who lived in the same apartment complex as his grandmother. He said that he had found the computer in a box in the hallway, and that he thought someone had left it there and had forgotten about it.

{¶13} While the interrogation lasted for over eight hours, it was punctuated by several lengthy breaks during which Shears was allowed to sleep. One break alone lasted for longer than 30 minutes, and many lasted 15 to 20 minutes. After each break, he seemed refreshed and was able to continue the interrogation. Investigators later brought Bingham into the interrogation room, and she repeatedly asked Shears to tell the truth.

{¶14} Eventually, Shears claimed that he was part of a group of individuals who had robbed Mr. Banatwala. He claimed that they had gained entry by knocking on the door and ducking under the peephole to trick him into opening the door. Shears said he had been the driver, and that the others had struck Mr. Banatwala and rendered him unconscious. The others had then put Mr. Banatwala in the back of the car—still alive—and the group had driven to an apartment building on Westwood Northern Boulevard, where he had been left in the parking lot. Investigators did not believe this account, since the area was one in which Mr. Banatwala would likely have been discovered. When they took Shears to the area and found nothing, Shears finally agreed to lead them to the body. Mr. Banatwala's body was found in a trunk in a garage of a home that had belonged to Shears's aunt. The vacant home's current owner had placed boards with screws sticking up around the doors to deter intruders. A broken piece from one of the screws matched a piece imbedded in Shears's shoe.

{¶15}    Shears was charged with the following relating to the robbery of the Deals store: aggravated robbery in violation of R.C. 2911.01(A)(3) and robbery in violation of R.C. 2911.02(A)(2).  With regard to the robbery of the Family Dollar store, Shears was charged with: aggravated robbery in violation of R.C. 2911.01(A)(1) with specifications, robbery in violation of R.C. 2911.02(A)(2), and having a weapon while under a disability in violation of R.C. 2923.13(A)(2).  And relating to the murder of Mr. Banatwala, Shears was charged with: aggravated murder in violation of R.C. 2903.01(B), murder in violation of R.C. 2903.02(B), aggravated robbery in violation of R.C. 2911.01(A)(3), robbery in violation of R.C. 2911.02(A)(3), aggravated burglary in violation of R.C. 2911.11(A)(1), burglary in violation of R.C. 2911.12(A)(1), kidnapping in violation of R.C. 2905.01(B)(1), tampering with evidence in violation of R.C. 2921.12(A)(1), and gross abuse of a corpse in violation of R.C. 2927.01(B).  The trial court denied Shears's motion to suppress that had attacked the propriety of his interrogation and had sought to suppress the statements he made.  After a trial to the bench, Shears was found guilty of all charges and sentenced as appears of record.

**Shears's Interrogation was Proper**

{¶16}    In his first assignment of error, Shears claims that the trial court should have suppressed the statements he made as a result of his interrogation.  We disagree.

{¶17}    In order to determine whether a pretrial statement is involuntary, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 13, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. An appellate court must determine whether the totality of

6

the circumstances surrounding the confession indicates that a defendant's "will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Otte,* 74 Ohio St.3d 555, 562, 660 N.E.2d 711 (1996); *State v. Dailey*, 53 Ohio St.3d 88, 559 N.E.2d 459 (1990), paragraph two of the syllabus.

{¶18}   Shears first argues that he did not voluntarily waive his *Miranda* rights because he was impaired by drugs or alcohol.  While Shears did state that he had been drinking alcohol throughout the day prior to his arrest, the video recording of his interrogation did not demonstrate any indication of intoxication or other impairment such that he could not effectively participate in the questioning.  Throughout the process, Shears appeared to be coherent, to understand what was happening, and was to be able to participate to the level that he was willing to do so.  Having independently reviewed the video recording, we agree with this assessment of the trial court.

{¶19}   Shears next argues that the nature of his interrogation demonstrated that his will had been overborne and that his statements were involuntary.  While the length of the confession was significant, there are a number of factors that indicate that the confession was voluntary.  First, he was allowed to take several breaks, during which he was allowed to sleep.  He was given water when he said he was thirsty.  He was allowed to see his girlfriend when he asked for her, and was allowed to talk to her.  At no time were the officers rude, intimidating, or coercive.  In fact, at no time during the interrogation did any of the officers involved raise their voices.  And while there were a few different officers involved in the interrogation, at no time were there more than two of them in the room.  And for the vast majority of the time, the interrogation consisted of only Shears and one officer.  Finally, even when Shears "confessed," the story he told the police—the involvement of other individuals, the fact that he was only the driver and did no harm to Mr. Banatwala—was tailored to minimize his culpability in the killing.

7

{¶20} Finally, Shears claims in his brief that the statements he made while in the police car locating Mr. Banatwala's body were involuntary because "the *Miranda* warnings initially provided were no longer effective during the subsequent interrogations." But in a recent case, the Ohio Supreme Court found no fault with a subsequent interrogation that occurred more than 30 hours after the initial *Miranda* warnings were issued. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865. In that case, the court noted that Powell had remained in continuous custody during the period, the subsequent statements were "primarily a more detailed retelling of the story he had already voluntarily told in his first statement, even though some new information was provided," and Powell was alert at the time. These factors were also present in this case. While Shears might admittedly have been somewhat tired, the man seen at the end of the video appeared sufficiently alert to render his statements voluntary.

{¶21} In the end, it was not coercive police tactics that overbore Shears's will, but rather effective police work that resulted in the accumulation of an overwhelming amount of evidence that, when presented to him, left him with no alternative but to admit his involvement. We overrule his first assignment of error.

**Calling Bingham as Court's Witness**

{¶22} In his second assignment of error, Shears claims that it was an abuse of discretion for the trial court to call his girlfriend, Lashawna Bingham, as a court's witness pursuant to Evid.R. 614(A). That rule states that "the court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The purpose of Evid.R. 614 is to allow the fact-finder to hear evidence that would be beneficial in the performance of its fact-finding

responsibilities and ascertaining the truth of the matter. *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218 (2nd Dist.).

{¶23} The basis for Shears's argument rests in the claim that the state did not provide a sufficient basis to show that Bingham was hostile or had changed her testimony, and that calling her as a court's witness allowed the state to lead Bingham with its questions—basically testifying for her. When the prosecutor asked the trial court to call Bingham as a court's witness, he said that she was "having difficulty remembering things, it's been traumatic." He said that she "provided essential information to the police about the identity of the person that committed the offense, and why it was done."

{¶24} The decision whether to call individuals as witnesses of the court is left to the "sound discretion" of the trial court. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980). We find no abuse of discretion in this case. While the prosecutor asked many leading questions, much of what Bingham said that was most damaging to Shears's case was not the result of leading questions. Additionally, with the significant physical and other evidence against Shears, most of what Bingham contributed was tertiary to the core factual substance of the state's case.

{¶25} It is also important to note that this matter was not tried before a jury. In a bench trial, a trial court is presumed to have considered only the relevant, material and competent evidence. *State v. Bays*, 87 Ohio St.3d 15, 28, 716 N.E.2d 1126 (1999).

{¶26} In light of the above, we cannot say that calling Bingham as a court's witness was an abuse of discretion. While the number of leading questions for the witness was significant, it was not overwhelming, nor was the substance of Bingham's testimony significant to the case overall. And since this was a bench trial, the possibility of any impropriety is minimal. Shears's second assignment of error is overruled.

### The Sufficiency and Weight of
### the Evidence

{¶27}   In his third assignment of error, Shears claims that his convictions were based upon insufficient evidence and contrary to the manifest weight of the evidence. We disagree.

{¶28}   To reverse a conviction for insufficient evidence, we must conclude that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. By contrast, when reviewing the weight of the evidence, we act as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We review the entire record, weigh the evidence, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice in finding the defendant guilty. *Id.*

{¶29}   With regard to the Deals robbery, Shears claims that there was no showing that he recklessly inflicted, or attempted to inflict, serious physical harm when he committed the robbery. But Shears came up behind the clerk, picked him up, and threw him to the floor. The trial court noted the viciousness with which Shears threw him to the ground. It also noted that Shears did not consider what he was throwing the victim onto when he did this. The victim landed partly on a box of merchandise on the floor which, as it turned out, was not filled with hard items. Had it been, his injuries would likely have been more significant.

{¶30}   As it relates to the Family Dollar robbery, Shears claims that the state failed to prove that he had an operable firearm when he committed the robbery. The clerk whom he robbed testified that Shears had threatened to kill her if she did not comply. She also testified that she felt something hard in Shears's pocket that she believed to be a gun. This court has held that a conviction for aggravated robbery with

gun specifications can be supported by evidence that a defendant has informed a victim that he has a gun and that he will shoot. *State v. Obsaint*, 1st Dist. No. C-060629, 2007-Ohio-2661. As in *Obsaint*, the victim was not in a position to observe the weapon or any movement that would indicate possession of a weapon because Shears was behind her. Also as in *Obsaint*, Shears's conduct and communication with the victim led the victim to believe that he was armed. On this record, including the combination of the threat and what the clerk felt in Shears's pocket, the trial court had sufficient circumstantial evidence before it to conclude that Shears was armed with an operable firearm when he robbed the Family Dollar Store.

{¶31} Concerning the crimes arising from the death of Mr. Banatwala, Shears argues generally that the state did not prove that he was involved in his disappearance and death. Alternatively, he claims that there was no proof that he intended to kill Mr. Banatwala. We disagree.

{¶32} Mr. Banatwala lived in the same apartment complex as Shears's grandmother. Shears was found with Mr. Banatwala's car, a car that Shears claimed that he had purchase from a "crack head" in a completely different part of town. Shears had the keys to both Mr. Banatwala's car and his apartment. Mr. Banatwala's computer, which had been in his apartment, was found in the home of Shears's girlfriend. Shears's fingerprints were found in Mr. Banatwala's apartment on the bedroom window under which Mr. Banatwala's empty wallet was later recovered. Mr. Banatwala's body was found in a home that had belonged to Shears's aunt. A piece of broken screw found in Shears's shoe matched screws left by the property's owner to deter break-ins. And, most significantly, Shears was able was able to lead police to Mr. Banatwala's body. Blood evidence in the trunk was consistent with the theory that Mr. Banatwala was alive when he was placed in the trunk. In fact, Shears told police that he believed that Mr.

11

Banatwala was merely unconscious when he was placed there. And the severity of the beating that Mr. Banatwala received supports the conclusion that his attacker wanted him dead.

{¶33} Having considered the entire record, we conclude that Shears's convictions were based upon sufficient evidence and were not against the manifest weight of the evidence. Therefore, we overrule his third assignment of error.

**Sentencing**

{¶34} In his fourth assignment of error, Shears claims that the trial court made several sentencing errors. We agree, in part.

{¶35} Shears was sentenced to ten years in prison for the aggravated robbery of the Deals store; the trial court merged the related robbery count into that offense. He was sentenced to ten years in prison for the aggravated robbery of the Family Dollar store, with three years for the gun specification, and five years in prison for having a weapon while under a disability. The trial court merged the related robbery count into the aggravated robbery offense. He was sentenced to life without parole for the aggravated murder of Mr. Banatwala, ten years for aggravated robbery, ten years for aggravated burglary, ten years for kidnapping, five years for tampering with evidence, and one year for gross abuse of a corpse. The trial court merged the related robbery count with the aggravated robbery conviction, and the burglary count with the aggravated burglary conviction. The trial court ordered Shears to serve all terms consecutively. In total, Shears received a sentence of life without parole plus 64 years in prison.

{¶36} Shears claims that the aggravated murder, aggravated robbery, aggravated burglary, and kidnapping were all allied offenses of similar import. Under R.C. 2941.25, a trial court may convict a defendant for two or more allied offenses if the

offenses were committed with a separate animus as to each offense. *State v. Anderson*, 1st Dist. No. C-110029, 2012-Ohio-3347, 974 N.E.2d 1236, ¶ 15, citing *State v. Bickerstaff*, 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (1984), and *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 51.

{¶37} This court reviews allied-offense issues by examining the evidence adduced before the trial court, and if the evidence shows that the state relied upon the same conduct to prove the offenses, and that the offenses were committed neither separately nor with a separate animus as to each, then the defendant is afforded the protections of R.C. 2941.25. The trial court errs if it imposes separate sentences for the offenses. *Anderson* at ¶ 20; *Johnson* at ¶ 56.

{¶38} We begin with the aggravated murder conviction. In *State v. Tibbs*, this court addressed the issue of the merger of aggravated murder and other offenses. We held that "the offender's conduct demonstrated a purpose—a specific intent—to kill while, or in the course of, committing an aggravated robbery, we hold that the two offenses were committed with a separate animus and thus were separately punishable under R.C. 2941.25(B)." *State v. Tibbs*, 1st Dist. No. C-100378, 2011-Ohio-6716, ¶ 48. In this case, the trial court noted that the beating that Mr. Banatwala received from Shears was severe. It was much more severe than what was necessary to complete the other offenses. This evidence established an intent to kill that is distinct from the commission of the other crimes. *See State v. Whipple*, 1st Dist. No. C-110184, 2012-Ohio-2938, ¶ 39 (when the conduct so exceeds the degree required to commit the one offense, a separate animus is demonstrated as to a second offense).

{¶39} We next address the kidnapping. As the Ohio Supreme Court has noted, the commission of aggravated robbery necessarily entails the restraint of the victim. *See State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). Where "the restraint is

prolonged, the confinement is secretive, or the movement is so substantial as to demonstrate a significance independent of the robbery, there exists a separate animus, a separate 'immediate motive,' to support the kidnapping conviction." *State v. Chaffer*, 1st Dist. No. C-090602, 2010-Ohio-4471, ¶ 11, quoting *Logan* at syllabus.

{¶40} In this case, the evidence presented at trial indicated that Mr. Banatwala was likely alive when he was placed in the car trunk by Shears. Clearly removing him from the apartment at all was much more substantial than the restraint necessary to commit the aggravated robbery in this case.

{¶41} Finally, we address the convictions for aggravated robbery and aggravated burglary. The problem with these two separate convictions is that the conduct that provides the aggravation for both counts is the same: the physical harm that Shears caused to Mr. Banatwala in order to rob him. Since this was the same conduct that was committed with the same animus, the two counts must merge.

{¶42} We note that the trial court found Shears guilty of burglary and robbery, but merged those counts with their aggravated counterparts. On remand, he can be convicted of the lesser version of the merged counts. In other words, Shears can be convicted of robbery and aggravated burglary or of aggravated robbery and burglary. But he cannot be convicted of both aggravated offenses.

{¶43} Shears also argues that he could not be separately convicted of gross abuse of a corpse and tampering with evidence. We agree. The basis of both charges was Shears's conduct of placing Mr. Banatwala's body in the trunk in the garage of the vacant house. Therefore, there was not a separate animus that would allow the trial court to sentence Shears for both offenses. *See State v. Crisp*, 4th Dist. No. 10CA3404, 2012-Ohio-1730, ¶ 38-39 (ordering the merger of a gross-abuse-of-a-corpse count and a tampering-with-evidence count when both arose from the disposal of one body).

{¶44}  In addition to the above noted errors regarding merger, the trial court erred when it sentenced Shears to five years in prison for having a weapon while under a disability and tampering with evidence.  These are felonies of the third degree and are now subject to a maximum sentence of 36 months.  The trial court also erred when it ordered Shears to serve his sentences consecutively without making the findings required by R.C. 2929.14(C)(4).  The state has conceded error on these points.

{¶45}  In sum, the trial court erred when it failed to merge either the aggravated robbery conviction or the aggravated burglary conviction.  On remand, the trial court is free to sentence on the lesser offense of either robbery or burglary depending on which aggravated offense the state elects.  The trial court also erred when it failed to merge gross abuse of a corpse with tampering with evidence.  The trial court must also resentence Shears to no more than 36 months in prison for the two third-degree felonies of having a weapon while under a disability and tampering with evidence.  The trial court also must comply with R.C. 2929.14(C)(4) in determining whether consecutive sentences are proper in this case.  The fourth assignment of error is sustained in part and overruled in part.

### Conclusion

{¶46}  For the above reasons, the decision of the trial court is affirmed in part, the sentences are vacated in part, and this cause is remanded for resentencing in accordance with the law and this opinion.

Judgment affirmed in part, sentences vacated in part, and cause remanded.

HILDEBRANDT, P.J., and HENDON, J,. concur.

Please note:
The court has recorded its own entry on the date of the release of this opinion.

15